CLERK'S OFFICE U.S. DISTRICT COURT
AT CHARLOTTESVILLE, VA
FILED

MAR 11 2024

LAURA A. AUSTIN, CLERK
BY: /s/
DEPUTY CLERK

J. Bryan Quesenberry
2750 SW Coast Ave.
Lincoln City, OR 97367
801-473-9951
jbq.esq@gmail.com
*Plaintiff/Relator*

---

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel. J. BRYAN QUESENBERRY,<br><br>Plaintiff/Relator,<br><br>vs.<br><br>BREAKS INTERSTATE PARK COMMISSION; CHARLOTTESVILLE REDEVELOPMENT & HOUSING AUTHORITY; ROCKBRIDGE REGIONAL LIBRARY; CROSSROADS COMMUNITY SERVICES BOARD; and RAPPAHANNOCK RAPIDAN COMMUNITY SERVICES BOARD a/k/a ENCOMPASS COMMUNITY SUPPORTS,<br><br>Defendants. | **COMPLAINT FOR VIOLATION OF FEDERAL FALSE CLAIMS ACT**<br><br>**(Filed in camera and under seal)**<br>**(DO NOT PLACE ON PACER)**<br><br>JURY TRIAL DEMANDED<br><br>Civil Action No. 3:24cv00016 |

Plaintiff-Relator J. Bryan Quesenberry, a licensed attorney acting *pro se* on behalf of the United States of America (the **"Government"** or the **"Federal Government"**) and against each Defendant, alleges, based upon personal knowledge, relevant documents, information, and belief, as follows.

## **INTRODUCTION**

1. This is an action to recover damages and civil penalties on behalf of the United States of America arising from false and/or fraudulent records, statements, and claims made and

caused to be made by each Defendant and/or its agents and employees, in violation of the federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.* (**"FCA"**).

2. This action seeks to recover more than $6 million wrongfully loaned to Defendants through the Federal Government's Payroll Protection Program (**"PPP"**). The PPP provided a pathway to borrowers to receive forgiveness of these loans.

3. Each Defendant is a government-owned and -controlled entity, as detailed below.

4. As such, each Defendant was not entitled to PPP funds. *See*, 13 CFR 120.110(j) ("government-owned entities" are ineligible to receive SBA loans).

5. Rather, as a government-owned and -controlled entity, each Defendant was eligible for Covid relief funds through programs other than the PPP, including, for example, the American Rescue Plan Act and the State and Local Fiscal Recovery Funds program.

6. Nevertheless, each Defendant represented in its PPP application that it was eligible for a PPP loan.

7. Because Defendants obtained (and were forgiven of) more than $6 million in PPP funds, despite being ineligible, other eligible small businesses were denied the opportunity to borrow and use that PPP money.

## HISTORY OF THE FALSE CLAIMS ACT

8. Pursuant to the PPP, the Federal Government spent hundreds of billions of dollars in stimulus funding, as well as other federal funding, to support and aid small businesses through the coronavirus pandemic.

9. The FCA was enacted during the Civil War, and was substantially amended in 1986, and again in 2009 and 2010. Congress amended the FCA in 1986 to enhance the Federal Government's ability to recover losses sustained as a result of fraud against the United States after finding that fraud in federal programs was pervasive and that the FCA, which Congress

2

characterized as a primary tool for combating government fraud, was in need of modernization. The amendments create incentives for individuals to come forward with information about fraud against the Federal Government without fear of reprisals or inaction, and enable the use of private legal resources to prosecute fraud claims on the Federal Government's behalf.

10. The FCA prohibits, *inter alia*: (1) knowingly presenting, or causing to be presented, a false or fraudulent claim for payment or approval; and (2) knowingly making or using, or causing to be made or used, a false or fraudulent record or statement material to a false or fraudulent claim. 31 U.S.C. §§ 3729(a)(1)(A), (B). Anyone who violates the FCA is liable for a civil penalty for each such claim, <u>plus three times the amount of the damages</u> sustained by the Government. 31 U.S.C. § 3729(a)(1)(A) (as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 [28 U.S.C. § 2461 note; Public Law 104-410]).

11. In 2009, Congress amended the FCA to clarify that a "claim" includes "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property that (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest…" 31 U.S.C. § 3729(b)(2).

12. The FCA allows any person having information about an FCA violation to bring an action for himself and the Federal Government, and to share in any recovery. The FCA requires that the complaint be filed under seal for a minimum of 60 days (without service on Defendant during that time) to allow the Federal Government time to conduct its own investigation and to determine whether to join the suit.

3

13. Based on the foregoing laws, *qui tam* Plaintiff/Relator seeks through this action to recover all available damages, civil penalties, and other relief for the violations alleged herein in every jurisdiction to which each Defendant's misconduct has extended.

## PARTIES

14. Plaintiff/Relator J. Bryan Quesenberry ("**Relator**") is a resident of Oregon. He is an attorney licensed to practice law in Utah and Oregon and brings this action on behalf of the United States of America, the real party in interest.

15. Defendant Breaks Interstate Park Commission ("**Breaks Commission**") is a government entity located in Dickenson County, Virginia.

16. Defendant Charlottesville Redevelopment & Housing Authority ("**Charlottesville Authority**") is a government entity located in Albemarle County, Virginia.

17. Defendant Rockbridge Regional Library ("**Rockbridge Library**") is a government entity located in Rockbridge County, Virginia.

18. Defendant Crossroads Community Services Board ("**Crossroads Board**") is a government entity located in Prince Edward County, Virginia.

19. Defendant Rappahannock Rapidan Community Services Board a/k/a Encompass Community Supports ("**RR Board**") is a government entity located in Culpeper County, Virginia.

## JURISDICTION AND VENUE

20. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730. Although this issue is no longer jurisdictional after the 2009 amendments to the FCA, upon information and belief there has been no statutorily relevant public disclosure of the "allegations or transactions" in this

4

Complaint, as those concepts are used in 31 U.S.C. § 3730(e), as amended by Pub. L. No. 111-148, § 10104(j)(2), 124 Stat. 119, 901-02.

21. Moreover, whether or not such a disclosure has occurred, Relator would qualify as an "original source" of the information on which the allegations or transactions in this Complaint are based. Relator researched and discovered the pertinent entity information and individual information of each Defendant.

22. This Court has personal jurisdiction over each Defendant pursuant to 31 U.S.C. § 3732(a) because that section authorizes nationwide service of process and because each Defendant is a government entity located in the Western District of Virginia.

23. Venue is proper in the Western District of Virginia pursuant to 28 U.S.C. § 1391(b)-(c) and 31 U.S.C. § 3732(a) because each Defendant is a government entity located in the Western District of Virginia, and because violations of 31 U.S.C. §§ 3729 *et seq*. alleged herein occurred within this district.

## THE PAYCHECK PROTECTION PROGRAM

24. Congress added sections 1102 and 1106 of the Coronavirus Aid, Relief, and Economic Security Act **("CARES Act")**. Section 1102 contained a new program called the Paycheck Protection Program **("PPP")** and was part of the U.S. Small Business Administration's **("SBA")** 7(a) Loan Program. These two sections were intended to provide economic relief to small businesses nationwide adversely impacted by the coronavirus pandemic and the COVID-19 Emergency Declaration issued by then-President Trump on March 13, 2020.

25. Due to the COVID-19 emergency, many small businesses nationwide were experiencing economic hardship as a direct result of the Federal, State, and local public health measures that were being taken to minimize the public's exposure to the coronavirus.

26. The SBA received funding and authority through the CARES Act to modify existing loan programs and establish the new PPP loan program to assist small businesses nationwide adversely impacted by the coronavirus pandemic.

27. Section 1102 of the Act temporarily permitted SBA to guarantee 100% of 7(a) loans under the PPP. Section 1106 of the CARES Act provided for forgiveness of up to the full principal amount of qualifying loans guaranteed under the PPP.

28. The CARES Act was intended to provide relief to America's small businesses expeditiously.

29. The CARES Act gave lenders delegated authority to process loan applications for PPP funding. SBA allowed lenders to rely on certifications of the borrowers in order to determine eligibility of the borrower and use of loan proceeds, and to rely on specified documents provided by the borrower to determine qualifying loan amount, and eligibility for loan forgiveness. Lenders were held harmless for borrowers' failures to comply with PPP rules.

30. Defendants submitted documentation attempting to establish eligibility such as payroll processor records, payroll tax filings, form 1099s, and income and expenses documentation.

31. On the PPP application, a representative of Defendants had to certify in good faith to a number of representations to the Federal Government. The second bullet point under the CERTIFICATIONS AND AUTHORIZATIONS section on the PPP loan application states:

> ***The Applicant is eligible to receive a loan*** under the rules in effect at the time this application is submitted that have been issued by the Small Business Administration (SBA) implementing the Paycheck Protection Program under Division A, Title I of the Coronavirus Aid, Relief, and Economic Security Act (CARES Act) (the Paycheck Protection Program Rule). [Emphasis added].

32. Another certification on the application states, "Current economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant."

6

33. Defendants also "further certif[ied] that the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects."

34. Finally, Defendants certified that they "underst[ood] that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law, including under 18 USC 1001 and 3571 by imprisonment of not more than five years and/or a fine of up to $250,000; under 15 USC 645 by imprisonment of not more than two years and/or a fine of not more than $5,000; and, if submitted to a federally insured institution, under 18 USC 1014 by imprisonment of not more than thirty years and/or a fine of not more than $1,000,000."

## ALLEGATIONS

### Government-Owned Entities Are Not Eligible to Receive PPP Loans

35. Title I, Section 1102(a)(i)(D)(i) of the CARES Act indicates that borrowers must comply with certain eligibility requirements.

36. One such eligibility requirement is found in the Code of Federal Regulations that states "government-owned entities" are ineligible to receive SBA loans, which would include PPP loans. *See*, 13 CFR 120.110(j).

### Defendants Are Government-Owned Entities

37. The following information establishes that Defendants are government-owned entities.

**Breaks Commission**

38. The Breaks Commission's purpose is to "develop, maintain and operate Breaks Interstate Park in cooperation with the Commonwealth of Kentucky."[1] The Breaks Interest Park

---

[1] https://www.commonwealth.virginia.gov/va-government/boards-and-commissions/comprehensive-board-listing/detail/?id=b81d296a-b375-ed11-81ab-001dd80724a2

is a massive interstate park "nestled in the heart of the Appalachian Mountains," known by the nickname "Grand Canyon of the South,"[2] and sits astride the state line shared by Kentucky and Virginia.

39. The Kentucky Legislature and the Virginia Legislature created the Breaks Commission by interstate compact in 1954 ("Breaks Interstate Park Compact of 1954" or "Compact"), which allowed the two states to create, develop, and operate the Breaks Interstate Park. The U.S. Congress authorized the Compact. The Compact clearly indicates the Breaks Commission is government-owned and government-operated based on the following provisions from Virginia's enactment of the Compact:

> a. The 83rd Congress of the United States, being Public Law 275, approved August 14, 1953, authorized the Compact. VCA § 10.1-205.1, sec. 1.
>
> b. "The Commonwealth of Kentucky and the Commonwealth of Virginia agree to *create, develop and operate an interstate park to be known as the Breaks Interstate Park*, which shall be located.... Said park shall be of such area and of such character as may be *determined by the Commission created by this Compact*." *Id.* at sec. 1, art. 1 (emphasis added).
>
> c. "There is hereby *created the Breaks Interstate Park Commission*, which shall be a body corporate with the power and duties set forth herein and such additional *powers as may be conferred upon it by subsequent action of the appropriate authorities of Kentucky and Virginia*. The Commission shall consist of the Director of the Virginia Department of Conservation and Recreation or his designee and the Commissioner of the Kentucky Department of Parks or his designee as voting, ex officio members, and three commissioners from each of the two states, each of whom shall be a citizen of the state he shall represent. *Members of the Commission shall be appointed by the Governor.*" *Id.* at sec. 1, art. 2 (emphasis added).
>
> d. "The Commission created herein *shall be a joint corporate instrumentality of both the Commonwealth of Kentucky and the Commonwealth of Virginia* for the purpose of effecting the objects of this Compact, and shall be deemed

---

[2] https://www.breakspark.com/

8

       to be *performing governmental functions of the two states* in the performance of its duties hereunder." *Id.* at sec. 1, art. 3 (emphasis added).

    e. "Each Commonwealth agrees that it will authorize the Commission to exercise the right of *eminent domain* to acquire property located within each Commonwealth required by the Commission to effectuate the purposes of this Compact." *Id.* (Emphasis added); *see also*, sec. 2 ("The Breaks Interstate Park Commission is authorized to exercise the right of eminent domain on behalf of the Commonwealth of Virginia in acquiring land or other property required in the establishment or enlargement of a Breaks Interstate Park.")

    f. "The Commission shall be entitled to the services of any State officer or agency in the same manner as any other department or agency of this State." *Id.* at sec. 1, art. 5.

40. Kentucky's version of the Compact is found in KRS 148.220.

41. The official website of the Secretary of the Commonwealth of Virginia includes the Commission on its list of "State Boards and Commissions."[3]

**Charlottesville Authority**

42. The Charlottesville Authority manages about 376 public housing units in and around Charlottesville, Virginia.

43. The Charlottesville City Council created the Charlottesville Authority by adopting a resolution calling for an April 15, 1954 referendum to create a housing authority.[4] Voters approved the referendum. This city referendum is a creature of the following state statutes, which further indicate the Charlottesville Authority is a government-owned and government-operated entity:

    a. "In each locality there is hereby created a political subdivision of the Commonwealth, **with such public and corporate powers** as are set forth in this chapter, to be known respectively as the ' (insert name of locality)

---

[3] https://www.commonwealth.virginia.gov/va-government/boards-and-commissions/comprehensive-board-listing/

[4] https://weblink.charlottesville.org/Public/DocView.aspx?id=307478&cr=1, p. 2 of 3.

Redevelopment and Housing Authority' or by an appropriate name and title to be determined by each locality (hereinafter referred to as 'authority')." VCA § 36-4 (emphasis added).

b. Commissioners of the Charlottesville Authority were/are appointed by the City of Charlottesville: "When the need for an authority to be activated in a city or county has been determined in the manner prescribed by law, the governing body of the city or county shall appoint not more than nine or less than five persons as commissioners of the authority created for such city or county." VCA § 36-11. *See also*, https://cvillerha.com/commissioners/

c. The Charlottesville Authority has the government power of eminent domain: "A local governing body may, on behalf of an authority, acquire through the exercise of the power of eminent domain any single-family or multi-family dwelling unit within the authority's area of operation…" VCA § 36-19.5(B)

d. The Charlottesville Authority is subject to Virginia's public records law: "All records of an authority shall be public records…" VCA § 36-5.

e. The Charlottesville Authority is subject to Virginia's public meetings law: "'Public body' means any legislative body, *authority*, board, bureau, commission…" VCA § 2.2-3701 (emphasis added).

f. Charlottesville Authority "shall constitute a *political subdivision* of the Commonwealth with public and corporate powers…" VCA § 36-19 (emphasis added).

44. The official website of the City of Charlottesville lists the Charlottesville Authority among the city's "Boards & Commissions." It further identifies the Charlottesville Authority as "an independent political subdivision of the Commonwealth of Virginia."[5]

45. According to the Charlottesville Authority policies dated February 2022, it "is a *governmental or public body*, created and authorized by state law to develop and operate housing and housing programs for low-income families."[6] (Emphasis added).

---

[5] https://www.charlottesville.gov/1179/Charlottesville-Redevelopment-Housing-Au

[6] https://d5mc8f.p3cdn1.secureserver.net/wp-content/uploads/2021/12/Admissions-and-Continued-Occupancy-Policy-2.22.pdf, p. 19.

10

46. Finally, in *Virginia Elec. & Power Co. v. Hampton Redevelopment & Hous. Auth.*, 217 Va. 30, 32, 225 S.E.2d 364, 366 (1976), the housing authority asserted that such authorities were "a governmental entity and a political subdivision and arm of the Commonwealth performing 'governmental functions.'"

**Rockbridge Library**

47. Virginia has a robust statutory scheme that creates a series of local and regional libraries around the state. The following statutes indicate that such libraries are government-owned and government-operated:

> a. Public library service is part of the Commonwealth's provision for public education. VCA § 42.1-46 ("It is hereby declared to be the policy of the Commonwealth, as a part of its provision of essential service to communities and for public education, to promote the establishment and development of public library service ***throughout its various political subdivisions***.") (Emphasis added).
>
> b. "Two or more political subdivisions, (counties or cities), by action of their governing bodies, may join in establishing and maintaining a regional free library system under the terms of a contract between such political subdivisions; provided, that in the case of established county or city free library systems, the library boards shall agree to such action." VCA § 42.1-37.
>
> c. "The management and control of a free public library system shall be vested in a board of not less than five members or trustees. They shall be appointed by the governing body…" VCA § 42.1-35.A.
>
> d. "The members of the board of a regional library system shall be appointed by the respective governing bodies represented." VCA § 42.1-39.

48. Rockbridge Library is a regional public library that serves Rockbridge County, Bath County, the City of Lexington, and the City of Buena Vista.[7]

---

[7] https://www.rrlib.net/board-of-trustees/

49. The City of Lexington lists Rockbridge Library among the city's "Boards and Commissions" on its official website.[8]

50. The County of Rockbridge's comprehensive annual financial report for the fiscal year ended June 30, 2018, describes Rockbridge Library as one of several "intergovernmental (joint) ventures."[9]

51. The 2019 federal tax return (Form 990) filed by the Rockbridge Regional Library Foundation, a 501(c)(3) corporation whose mission is to "support the Rockbridge Regional Library," classifies Rockbridge Library as "[a] federal, state, or local government or governmental unit described in section 170(b)(1)(A)(v)"[10] in Schedule A (Public Charity Status and Public Support).[11]

52. Rockbridge Library is subject to Virginia's Freedom of Information Act.[12]

53. Rockbridge Library is also subject to Virginia's public meetings law. VCA § 2.2-3701 ("'Public body' means any legislative body, authority, board, bureau, commission, district, or agency of the Commonwealth or of any political subdivision of the Commonwealth, including counties, cities, and towns, municipal councils, governing bodies of counties, school boards, and planning commissions; governing boards of public institutions of higher education; and other organizations, corporations, or agencies in the Commonwealth supported wholly or principally by public funds.").

---

[8] https://www.lexingtonva.gov/government/boards-and-commissions/rockbridge-regional-library-board

[9] https://www.co.rockbridge.va.us/Archive/ViewFile/Item/1256, p. 29.

[10] This is a reference to 26 U.S. Code § 170.

[11] https://projects.propublica.org/nonprofits/organizations/541643261/202042819349301119/full

[12] *See*, Confidentiality of Patron Records policy at https://www.rrlib.net/policies/

**Crossroads Board and RR Board**

54. Crossroads Board and RR Board are each a "Community services board" defined by VCA § 37.2-100(7) as "the *public body* established pursuant to § 37.2-501 that provides mental health, developmental, and substance abuse services *within each city and county that established it.*" (Emphasis added).

55. The Virginia Legislature requires every city or county to establish a community services board. VCA § 37.2-500(A) ("*Every city or county shall establish a community services board by itself or in any combination with other cities and counties*, unless it establishes a behavioral health authority pursuant to Chapter 6 (§ 37.2-600 et seq.). In order to provide comprehensive mental health, developmental, and substance abuse services within a continuum of care, *the community services board shall function as the single point of entry into publicly funded mental health, developmental, and substance abuse services.*" (Emphasis added).

56. "The board appointed pursuant to this section shall be responsible to the governing body of each county or city that established it." VCA § 37.2-501.

Crossroads Board

57. In addition to the above statutes describing Crossroads Board as a governmental entity, Relator has discovered other websites and records that reach the same conclusion.

58. Crossroads Board's website states, "Crossroads Community Services Board was organized in 1973 as a cooperative venture among the counties of Amelia, Buckingham, Charlotte, Cumberland, Lunenburg, Nottoway, and Prince Edward. The Services Board, the governing body over the agency's programs, consists of representatives appointed by the Board of Supervisors in each county..."[13]

---

[13] https://crossroadscsb.org/about/

13

59. Crossroads Board has enacted a series of Bylaws, which further establish it as a government-owned and government-operated entity:

 a. ***"The purpose of the Board shall be to act as the agent of Amelia, Buckingham, Charlotte, Cumberland, Lunenburg, Nottoway, and Prince Edward Counties,*** Virginia, in the establishment and operation of community mental health, intellectual and developmental disability, and addiction and recovery treatment services in accordance with Chapter 5 of Title 37.2 of the Code of Virginia (2015), as amended." Bylaws, Art. II.[14] (Emphasis added).

 b. "The membership of the Board shall consist of fourteen (14) individuals who shall be appointed by the Board of Supervisors of the county they represent in accordance with Section 37.2-501 and 37.2-502 of the Code of Virginia."[15]

 c. ***"The Board shall be the agent of the governmental entities which have established it and shall be subject to the laws and regulations relating to such agencies of those governments*** and shall have the general powers, duties, and responsibilities of a Board as outlined in 37.2-504 of the Code of Virginia (2015), as amended."[16]

 d. Board meetings are subject to Virginia's Freedom of Information Act and public meetings laws.[17]

60. In its 2020 federal tax return (Form 990), the Crossroads Board classified itself as "[a] federal, state, or local government or governmental unit described in section 170(b)(1)(A)(v)."[18]

---

[14] https://crossroadscsb.org/wp-content/uploads/2023/04/Crossroads-Board-By-laws.pdf

[15] *Id.* at Art. III, Sec. 1.

[16] *Id.* at Art. IV (emphasis added)

[17] *Id.* at Art. VII, Sec. 6 and 7.

[18] https://projects.propublica.org/nonprofits/organizations/540988560/202200619349301550/full

61. The Crossroads Board's audited financial statements for the years ended June 30, 2021 and 2020, were "prepared in conformity with accounting principles generally accepted in the United States of America (GAAP) *as applied to governmental units*."[19] (Emphasis added)

62. These financial statements also note that, "In accordance with the determination by the Virginia Department of Behavioral Health and Developmental Services that *all operating service boards in Virginia are governmental healthcare entities*, [the Commission] follows the governmental enterprise model."[20]

63. The financial statements further note:

Statutes authorize *local government and other public bodies, such as the Agency* [the Commission], to invest in obligations of the United States or agencies thereof, obligations of the Commonwealth of Virginia or political subdivisions thereof, obligations of the International Bank for Reconstruction and Development (World Bank), the Asian Development Bank, the African Development Bank, "prime quality" commercial paper and certain corporate notes, banker's acceptances, repurchase agreements, *and the State Treasurer's Local Government Investment Pool* (LGIP). Investments are stated at fair value.[21]

RR Board

64. In addition to the above statutes in ¶¶ 55-57 describing RR Board as a governmental entity, Relator has discovered other websites and records that reach the same conclusion.

---

[19] https://projects.propublica.org/nonprofits/display_audit/7904820211

[20] *Id.* (Emphasis added).

[21] *Id.* (Emphasis added).

15

65. The official website of Culpeper County, Virginia, notes that the RR Board was "formed in 1972 by the local governments of Planning District 9 ([the counties of] Culpeper, Fauquier, Madison, Orange and Rappahannock)."[22]

66. The Virginia Department of Behavioral Health and Development Services classifies the RR Board as an "operating" community service board, which it defines as a "public body organized in accordance with the provisions of Chapter 5 (§ 37.2-500 et seq.) that is appointed by and accountable to the governing body of each city and county that established it for the direct provision of mental health, developmental, and substance abuse services."[23]

67. The RR Board's audited financial statements for the years ended June 30, 2021 and 2020, acknowledge that it is "a ***governmental health care entity*** and is required to follow the accounting and reporting practices of the Governmental Accounting Standards Board."[24]

68. The financial statements also note that the RR Board "maintains cash accounts with financial institutions in accordance with the Virginia Security for ***Public Deposits*** Act of the Code of Virginia (1950), as amended."[25]

69. The financial statements further note that employees of the RR Board are eligible to participate in the Virginia Retirement System (VRS) Political Subdivision Retirement Plan, which "provides coverage to state employees, teachers, and employees of participating political subdivisions."[26]

---

[22] https://web.culpepercounty.gov/bc/page/rappahannock-rapidan-community-services-board

[23] https://dbhds.virginia.gov/library/community%20contracting/occ-csb-overview.pdf

[24] https://projects.propublica.org/nonprofits/display_audit/7904820211 (Emphasis added)

[25] *Id.* at 18 (Emphasis added)

[26] *Id.* at 20.

16

70. The complaint in *Carpenter v. Rappahannock Rapidan Community Services Board and Area Agency on Aging*, Case No. 3:2011cv00017, filed on February 24, 2011, in the Western District of Virginia, stated in paragraph 3: "The RRCSB [Rappahannock Rapidan Community Services Board] is a governmental agency established, defined and controlled by statute." The same allegation appears in paragraph 3 of an amended complaint filed on April 21, 2011. In its answer to the amended complaint, the Rappahannock Board "admit[ted] that RRCSB is a governmental agency."

**Defendants' PPP Loans**

71. The Breaks Commission applied and was approved for a <u>first-draw</u> PPP loan on May 11, 2020 (loan number 4851997408), in the amount of $232,000.00, received said PPP loan, and had said PPP loan forgiven on February 9, 2021, in the amount of $233,728.88.

72. The Breaks Commission applied and was approved for a <u>second-draw</u> PPP loan on March 13, 2021 (loan number 1956988600), in the amount of $288,916.00, received said PPP loan, and had said PPP loan forgiven on January 3, 2022, in the amount of $291,195.67.

73. The Charlottesville Authority applied and was approved for a <u>first-draw</u> PPP loan on April 30, 2020 (loan number 6036737305), in the amount of $202,293.00, received said PPP loan, and had said PPP loan forgiven on December 31, 2020, in the amount of $203,579.81.

74. The Charlottesville Authority applied and was approved for a <u>second-draw</u> PPP loan on March 15, 2021 (loan number 2571198603), in the amount of $270,932.00, received said PPP loan, and had said PPP loan forgiven on November 8, 2021, in the amount of $272,632.85.

75. The Rockbridge Library applied and was approved for a <u>first-draw</u> PPP loan on April 15, 2021 (loan number 4233928800), in the amount of $160,890.00, received said PPP loan, and had said PPP loan forgiven on September 1, 2021, in the amount of $161,493.89.

76. The Crossroads Board applied and was approved for a <u>first-draw</u> PPP loan on April 13, 2020 (loan number 4917457109), in the amount of $2,497,027.50, received said PPP loan, and had said PPP loan forgiven on May 18, 2021, in the amount of $2,523,365.50.

77. The RR Board applied and was approved for a <u>first-draw</u> PPP loan on April 9, 2020 (loan number 9523867005), in the amount of $2,375,000.00, received said PPP loan, and had said PPP loan forgiven on June 24, 2021, in the amount of $2,402,840.28.

78. Upon information and belief, Defendants retained their PPP funds and have not repaid them.

79. Relator reserves the right to amend this Complaint and expand these allegations upon review of the actual applications and supporting documentation submitted by each Defendant.

## CAUSES OF ACTION

### COUNT 1
**Violations of the FCA, 31 U.S.C. § 3729(a)(1)(A) Against All Defendants**
**(Submitting a False Claim for Approval)**

80. The above paragraphs are realleged and incorporated herein.

81. The FCA imposes liability on one who knowingly presents or causes to be presented a false or fraudulent claim for payment or approval. 31 U.S.C. § 3729(a)(1)(A).

82. Defendants knowingly presented or caused to be presented to the SBA claims for approval of PPP loan applications for which they were ineligible because they are government-owned entities.

83. Defendants' knowing false certifications on the PPP loan applications at issue herein were material to the government's decision to approve and then forgive their PPP loans. When submitting the PPP loan applications, Defendants had to certify they were compliant with

18

SBA's guidance and rules, that they were eligible for the loans, and that all information included on their application forms was true and accurate in all material respects.

84. But for Defendants' submission of their false claims, they would not have received the loans.

85. By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

86. This is a claim for treble damages and penalties under the FCA, 31 U.S.C. § 3729, *et seq*. Additionally, the United States is entitled to the maximum penalty of up to $11,000 for each and every violation arising from Defendants' unlawful conduct alleged herein.

## COUNT 2
### Violations of the FCA, 31 U.S.C. § 3729(a)(1)(B) Against All Defendants
### (Creating a False Record or Statement Material to a False Claim )

87. The above paragraphs are realleged and incorporated herein.

88. The FCA imposes liability on one who knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim paid or approved by the U.S. government. 31 U.S.C. § 3729(a)(1)(B).

89. Defendants knowingly made or caused to be made false records or statements to support false claims submitted to the SBA for PPP loans.

90. The false records and statements Defendants made were used to support false claims submitted to the U.S. government.

91. By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

92. This is a claim for treble damages and penalties under the FCA, 31 U.S.C. § 3729, *et seq*. Additionally, the United States is entitled to the maximum penalty of up to $11,000 for each and every violation arising from Defendants' unlawful conduct alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, *qui tam* Plaintiff/Relator prays for judgment against Defendants as follows:

1. That this Court enter judgment against Defendants in an amount equal to three times the damages the United Sates has sustained because of Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729;

2. That Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

3. That Relator be awarded all costs of this action, including attorney's fees and expenses; and

4. That Relator recover such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a trial by jury.

Dated: 3/4/24

Respectfully submitted,

_____
J. Bryan Quesenberry
Plaintiff/Relator

20