J. Bryan Quesenberry
903 E. 430 S.
Salem, UT 84653
801-473-9951
jbq.esq@gmail.com
*Plaintiff/Relator*

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| UNITED STATES OF AMERICA, <u>ex</u> <u>rel</u>. J. BRYAN QUESENBERRY, <br><br> Plaintiff/Relator, <br> vs. <br><br> BREAKS INTERSTATE PARK COMMISSION; CHARLOTTESVILLE REDEVELOPMENT & HOUSING AUTHORITY; ROCKBRIDGE REGIONAL LIBRARY; CROSSROADS COMMUNITY SERVICES BOARD; RAPPAHANNOCK RAPIDAN COMMUNITY SERVICES BOARD a/k/a ENCOMPASS COMMUNITY SUPPORTS; and UNKNOWN JOHN AND JANE DOES, <br><br> Defendants. | **AMENDED COMPLAINT FOR VIOLATION OF FEDERAL FALSE CLAIMS ACT** <br><br> JURY TRIAL DEMANDED <br><br><br> Civil Action No. 3:24-cv-16 RSB |

Plaintiff/Relator J. Bryan Quesenberry, a licensed attorney acting on behalf of the United States of America (the **"Government"** or the **"Federal Government"**) and against each Defendant, alleges, based upon personal knowledge, relevant documents, information, and belief, as follows.

## **INTRODUCTION**

1. This is an action to recover damages and civil penalties on behalf of the United States of America arising from false and/or fraudulent records, statements, and claims made and

caused to be made by each Defendant and/or its agents and employees, in violation of the federal False Claims Act, 31 U.S.C. §§ 3729, *et seq*. **("FCA")**.

2. This action seeks to recover more than $6 million wrongfully loaned to Defendants through the Federal Government's Payroll Protection Program **("PPP")**. The PPP provided a pathway to borrowers to receive forgiveness of these loans.

3. Each Defendant is a government-owned and -controlled entity, as detailed below.

4. As such, each Defendant was not entitled to PPP funds. *See*, 13 CFR 120.110(j) ("government-owned entities" are ineligible to receive SBA loans).

5. Rather, as a government-owned and -controlled entity, each Defendant was eligible for Covid relief funds through programs other than the PPP, including, for example, the American Rescue Plan Act and the State and Local Fiscal Recovery Funds program.

6. Nevertheless, each Defendant represented in its PPP application that it was eligible for a PPP loan.

7. Because Defendants obtained (and were forgiven of) more than $6 million in PPP funds, despite being ineligible, eligible small businesses were denied the opportunity to borrow and use that PPP money.

## HISTORY OF THE FALSE CLAIMS ACT

8. Pursuant to the PPP, the Federal Government spent hundreds of billions of dollars in stimulus funding, as well as other federal funding, to support and aid small businesses through the coronavirus pandemic.

9. The FCA was enacted during the Civil War, and was substantially amended in 1986, and again in 2009 and 2010. Congress amended the FCA in 1986 to enhance the Federal Government's ability to recover losses sustained as a result of fraud against the United States after finding that fraud in federal programs was pervasive and that the FCA, which Congress

2

characterized as a primary tool for combating government fraud, was in need of modernization. The amendments create incentives for individuals to come forward with information about fraud against the Federal Government without fear of reprisals or inaction, and enable the use of private legal resources to prosecute fraud claims on the Federal Government's behalf.

10. The FCA prohibits, *inter alia*: (1) knowingly presenting, or causing to be presented, a false or fraudulent claim for payment or approval; and (2) knowingly making or using, or causing to be made or used, a false or fraudulent record or statement material to a false or fraudulent claim. 31 U.S.C. §§ 3729(a)(1)(A), (B). Anyone who violates the FCA is liable for a civil penalty for each such claim, plus three times the amount of the damages sustained by the Government. 31 U.S.C. § 3729(a)(1)(A) (as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 [28 U.S.C. § 2461 note; Public Law 104-410]).

11. In 2009, Congress amended the FCA to clarify that a "claim" includes "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property that (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest…" 31 U.S.C. § 3729(b)(2).

12. The FCA allows any person having information about an FCA violation to bring an action for himself and the Federal Government, and to share in any recovery. The FCA requires that the complaint be filed under seal for a minimum of 60 days (without service on Defendant during that time) to allow the Federal Government time to conduct its own investigation and to determine whether to join the suit.

13. Based on the foregoing laws, *qui tam* Plaintiff/Relator seeks through this action to recover all available damages, civil penalties, and other relief for the violations alleged herein in every jurisdiction to which each Defendant's misconduct has extended.

**PARTIES**

14. Plaintiff/Relator J. Bryan Quesenberry ("**Relator**") is a resident of Utah. He is an attorney licensed to practice law in Utah and brings this action on behalf of the United States of America, the real party in interest.

15. Defendant Breaks Interstate Park Commission ("**Breaks Commission**") is a government entity located in Dickenson County, Virginia.

16. Defendant Charlottesville Redevelopment & Housing Authority ("**Charlottesville Authority**") is a government entity located in Albemarle County, Virginia.

17. Defendant Rockbridge Regional Library ("**Rockbridge Library**") is a government entity located in Rockbridge County, Virginia.

18. Defendant Crossroads Community Services Board ("**Crossroads Board**") is a government entity located in Prince Edward County, Virginia.

19. Defendant Rappahannock Rapidan Community Services Board a/k/a Encompass Community Supports ("**RR Board**") is a government entity located in Culpeper County, Virginia.

20. Defendants Unknown John and Jane Does are the officers, managers, owners, or agents of the other defendants who caused such defendants to submit the false claims described herein.

4

**JURISDICTION AND VENUE**

21.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730. Although this issue is no longer jurisdictional after the 2009 amendments to the FCA, upon information and belief there has been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint, as those concepts are used in 31 U.S.C. § 3730(e), as amended by Pub. L. No. 111-148, § 10104(j)(2), 124 Stat. 119, 901-02.

22.     Moreover, whether or not such a disclosure has occurred, Relator would qualify as an "original source" of the information on which the allegations or transactions in this Complaint are based. Relator exhaustively researched and discovered the pertinent entity information of Defendants. Relator used private, subscription-based services such as Dun & Bradstreet and the Nexis news library to research employee, business, and other pertinent information about Defendants. Relator was then able to gather and compile information and evidence from various websites and sources and add his own analysis to identify and accurately describe the allegations of fraud set forth herein. Moreover, there are no publicly disclosed allegations of false claims against Defendants (despite the fact that more than five years have elapsed since they applied for and received the PPP loans at issue). For example, publicly available information about Defendants' PPP loan on websites such as ProPublica.com does not allege a false claim.

23.     Relator then compared information to PPP loan data that lists loan amounts and forgiveness status, but does not disclose the borrower's PPP certifications or other misrepresentations at issue, and, standing alone, does not reveal fraud. Courts addressing PPP have recognized that PPP applications/certifications are non-public, and public SBA datasets do

5

not disclose the "essential elements" of fraud for FCA public-disclosure purposes. *See United States v. Hawthorne Machinery Co.*, No. 3:23-cv-xxx, 2024 WL 4294878, at *10–13 (S.D. Cal. Sept. 25, 2024). The fraud alleged here emerged only through Relator's independent analysis and expertise. Relator's allegations were therefore not publicly disclosed through any qualifying channel, are different in kind and degree from generalized public information, and materially add to whatever fragmented public data may exist.

24. This Court has personal jurisdiction over each Defendant pursuant to 31 U.S.C. § 3732(a) because that section authorizes nationwide service of process and because each Defendant is a government entity located in the Western District of Virginia.

25. Venue is proper in the Western District of Virginia pursuant to 28 U.S.C. § 1391(b)-(c) and 31 U.S.C. § 3732(a) because each Defendant is a government entity located in the Western District of Virginia, and because violations of 31 U.S.C. §§ 3729 *et seq.* alleged herein occurred within this district.

## THE PAYCHECK PROTECTION PROGRAM

26. Congress added sections 1102 and 1106 of the Coronavirus Aid, Relief, and Economic Security Act **("CARES Act")**. Section 1102 contained a new program called the Paycheck Protection Program **("PPP")** and was part of the U.S. Small Business Administration's **("SBA")** 7(a) Loan Program. These two sections were intended to provide economic relief to small businesses nationwide adversely impacted by the coronavirus pandemic and the COVID-19 Emergency Declaration issued by then-President Trump on March 13, 2020.

27. Due to the COVID-19 emergency, many small businesses nationwide were experiencing economic hardship as a direct result of the Federal, State, and local public health measures that were being taken to minimize the public's exposure to the coronavirus.

28. The SBA received funding and authority through the CARES Act to modify existing loan programs and establish the new PPP loan program to assist small businesses nationwide adversely impacted by the coronavirus pandemic.

29. Section 1102 of the Act temporarily permitted SBA to guarantee 100% of 7(a) loans under the PPP. Section 1106 of the CARES Act provided for forgiveness of up to the full principal amount of qualifying loans guaranteed under the PPP.

30. The CARES Act was intended to provide relief to America's small businesses expeditiously.

31. The CARES Act gave lenders delegated authority to process loan applications for PPP funding. SBA allowed lenders to rely on certifications of the borrowers in order to determine eligibility of the borrower and use of loan proceeds, and to rely on specified documents provided by the borrower to determine qualifying loan amount, and eligibility for loan forgiveness. Lenders were held harmless for borrowers' failures to comply with PPP rules.

32. Defendants submitted documentation attempting to establish eligibility such as payroll processor records, payroll tax filings, form 1099s, and income and expenses documentation.

33. On the PPP application, a representative of Defendants had to certify in good faith to a number of representations to the Federal Government. The second bullet point under the CERTIFICATIONS AND AUTHORIZATIONS section on the PPP loan application states:

> ***The Applicant is eligible to receive a loan*** under the rules in effect at the time this application is submitted that have been issued by the Small Business Administration (SBA) implementing the Paycheck Protection Program under Division A, Title I of the Coronavirus Aid, Relief, and Economic Security Act (CARES Act) (the Paycheck Protection Program Rule). [Emphasis added].

34. Another certification on the application states, "Current economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant."

7

35. Defendants also "further certif[ied] that the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects."

36. Finally, Defendants certified that they "underst[ood] that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law, including under 18 USC 1001 and 3571 by imprisonment of not more than five years and/or a fine of up to $250,000; under 15 USC 645 by imprisonment of not more than two years and/or a fine of not more than $5,000; and, if submitted to a federally insured institution, under 18 USC 1014 by imprisonment of not more than thirty years and/or a fine of not more than $1,000,000."

**ALLEGATIONS**

**Government-Owned Entities Are Not Eligible to Receive PPP Loans**

37. Title I, Section 1102(a)(i)(D)(i) of the CARES Act indicates that borrowers must comply with certain eligibility requirements.

38. The Code of Federal Regulations further adds that "government-owned entities" are ineligible to receive SBA loans, which would include PPP loans. *See*, 13 CFR 120.110(j).

39. A government-owned entity is an entity owned by a municipality or other political subdivision. *See*, SBA SOP 50 10 5(K), p. 108 ("Businesses owned by municipalities and other political subdivisions are not eligible."). In this context, ownership is synonymous with control – a government-owned entity is a government-controlled entity. To argue that one is different from the other raises a distinction without a difference. This interpretation is supported by the following sources.

40. The Federal Deposit Insurance Corporation (FDIC) issued General Guidance on Practices for Marketing to a Government-Owned Entity (GOE) in which the FDIC described GOEs as including "traditional government agencies, departments, and public enterprises" as

8

well as "government-owned and government-controlled entities." *See*, General Guidance, p. 8, at

https://www.fdic.gov/about/diversity/sbrp/410.pdf.

41.     A GOE is similar to a state-owned enterprise, which is characterized as:

a.  An entity formed by the government for the purpose of engaging in commercial activities;

b.  Fully or partially owned by the government;

c.  Representing the government in commercial endeavors. *See*,

https://www.investopedia.com/terms/s/soe.asp#:~:text=A%20state-owned%20enterprise.

## Defendants Are Government-Owned Entities

42.     The following information establishes that Defendants are government-owned entities.

## Charlottesville Authority

43.     The Charlottesville Authority manages about 376 public housing units in and around Charlottesville, Virginia.

44.     The Charlottesville City Council created the Charlottesville Authority by adopting a resolution calling for an April 15, 1954 referendum to create a housing authority.[1] Voters approved the referendum. This city referendum is a creature of the following state statutes, which further indicate the Charlottesville Authority is a government-owned and government-operated entity:

a.  "In each locality there is hereby created a political subdivision of the Commonwealth, ***with such public and corporate powers*** as are set forth in this chapter, to be known respectively as the ' (insert name of locality) Redevelopment and Housing Authority' or by an appropriate name and title to

---

[1] https://weblink.charlottesville.org/Public/DocView.aspx?id=307478&cr=1, p. 2 of 3.

be determined by each locality (hereinafter referred to as 'authority').” VCA § 36-4 (emphasis added).

b. Commissioners of the Charlottesville Authority were/are appointed by the City of Charlottesville: “When the need for an authority to be activated in a city or county has been determined in the manner prescribed by law, the governing body of the city or county shall appoint not more than nine or less than five persons as commissioners of the authority created for such city or county.” VCA § 36-11. *See also*, https://cvillerha.com/commissioners/

c. The Charlottesville Authority has the government power of eminent domain: “A local governing body may, on behalf of an authority, acquire through the exercise of the power of eminent domain any single-family or multi-family dwelling unit within the authority's area of operation…” VCA § 36-19.5(B)

d. The Charlottesville Authority is subject to Virginia's public records law: “All records of an authority shall be public records…” VCA § 36-5.

e. The Charlottesville Authority is subject to Virginia's public meetings law: “'Public body' means any legislative body, ***authority***, board, bureau, commission…” VCA § 2.2-3701 (emphasis added).

f. Charlottesville Authority “shall constitute a ***political subdivision*** of the Commonwealth with public and corporate powers…” VCA § 36-19 (emphasis added).

45.     The official website of the City of Charlottesville lists the Charlottesville Authority among the city's “Boards & Commissions.” It further identifies the Charlottesville Authority as “an independent political subdivision of the Commonwealth of Virginia.”[2]

46.     According to the Charlottesville Authority policies dated February 2022, it “is a ***governmental or public body***, created and authorized by state law to develop and operate housing and housing programs for low-income families.”[3] (Emphasis added).

47.     Finally, in *Virginia Elec. & Power Co. v. Hampton Redevelopment & Hous. Auth.*, 217 Va. 30, 32, 225 S.E.2d 364, 366 (1976), the housing authority asserted that such

---

[2] https://www.charlottesville.gov/1179/Charlottesville-Redevelopment-Housing-Au

[3] https://d5mc8f.p3cdn1.secureserver.net/wp-content/uploads/2021/12/Admissions-and-Continued-Occupancy-Policy-2.22.pdf, p. 19.

authorities were "a governmental entity and a political subdivision and arm of the Commonwealth performing 'governmental functions."

**Rockbridge Library**

48. Virginia has a robust statutory scheme that creates a series of local and regional libraries around the state. The following statutes indicate that such libraries are government-owned and government-operated:

    a. Public library service is part of the Commonwealth's provision for public education. VCA § 42.1-46 ("It is hereby declared to be the policy of the Commonwealth, as a part of its provision of essential service to communities and for public education, to promote the establishment and development of public library service *throughout its various political subdivisions*.") (Emphasis added).

    b. "Two or more political subdivisions, (counties or cities), by action of their governing bodies, may join in establishing and maintaining a regional free library system under the terms of a contract between such political subdivisions; provided, that in the case of established county or city free library systems, the library boards shall agree to such action." VCA § 42.1-37.

    c. "The management and control of a free public library system shall be vested in a board of not less than five members or trustees. They shall be appointed by the governing body…" VCA § 42.1-35.A.

    d. "The members of the board of a regional library system shall be appointed by the respective governing bodies represented." VCA § 42.1-39.

49. Rockbridge Library is a regional public library that serves Rockbridge County, Bath County, the City of Lexington, and the City of Buena Vista.[4]

50. The City of Lexington lists Rockbridge Library among the city's "Boards and Commissions" on its official website.[5]

---

[4] https://www.rrlib.net/board-of-trustees/

[5] https://www.lexingtonva.gov/government/boards-and-commissions/rockbridge-regional-library-board

51.     The County of Rockbridge's comprehensive annual financial report for the fiscal year ended June 30, 2018, describes Rockbridge Library as one of several "intergovernmental (joint) ventures."[6]

52.     The 2019 federal tax return (Form 990) filed by the Rockbridge Regional Library Foundation, a 501(c)(3) corporation whose mission is to "support the Rockbridge Regional Library," classifies Rockbridge Library as "[a] federal, state, or local government or governmental unit described in section 170(b)(1)(A)(v)"[7] in Schedule A (Public Charity Status and Public Support).[8]

53.     Rockbridge Library is subject to Virginia's Freedom of Information Act.[9]

54.     Rockbridge Library is also subject to Virginia's public meetings law. VCA § 2.2-3701 ("'Public body' means any legislative body, authority, board, bureau, commission, district, or agency of the Commonwealth or of any political subdivision of the Commonwealth, including counties, cities, and towns, municipal councils, governing bodies of counties, school boards, and planning commissions; governing boards of public institutions of higher education; and other organizations, corporations, or agencies in the Commonwealth supported wholly or principally by public funds.").

**Crossroads Board and RR Board**

55.     Crossroads Board and RR Board are each a "Community services board" defined by VCA § 37.2-100(7) as "the ***public body*** established pursuant to § 37.2-501 that provides

---

[6] https://www.co.rockbridge.va.us/Archive/ViewFile/Item/1256, p. 29.

[7] This is a reference to 26 U.S. Code § 170.

[8] https://projects.propublica.org/nonprofits/organizations/541643261/202042819349301119/full

[9] *See*, Confidentiality of Patron Records policy at https://www.rrlib.net/policies/

mental health, developmental, and substance abuse services ***within each city and county that establish it***." (Emphasis added).

56. The Virginia Legislature requires every city or county to establish a community services board. VCA § 37.2-500(A) ("***Every city or county shall establish a community services board by itself or in any combination with other cities and counties***, unless it establishes a behavioral health authority pursuant to Chapter 6 (§ 37.2-600 et seq.). In order to provide comprehensive mental health, developmental, and substance abuse services within a continuum of care, ***the community services board shall function as the single point of entry into publicly funded mental health, developmental, and substance abuse services***." (Emphasis added).

57. "The board appointed pursuant to this section shall be responsible to the governing body of each county or city that established it." VCA § 37.2-501.

<u>Crossroads Board</u>

58. In addition to the above statutes describing Crossroads Board as a governmental entity, Relator has discovered other websites and records that reach the same conclusion.

59. Crossroads Board's website states, "Crossroads Community Services Board was organized in 1973 as a cooperative venture among the counties of Amelia, Buckingham, Charlotte, Cumberland, Lunenburg, Nottoway, and Prince Edward. The Services Board, the governing body over the agency's programs, consists of representatives appointed by the Board of Supervisors in each county…"[10]

60. Crossroads Board has enacted a series of Bylaws, which further establish it as a government-owned and government-operated entity:

    a. "***The purpose of the Board shall be to act as the agent of Amelia, Buckingham, Charlotte, Cumberland, Lunenburg, Nottoway, and Prince***

---

[10] https://crossroadscsb.org/about/

*Edward Counties,* Virginia, in the establishment and operation of community mental health, intellectual and developmental disability, and addiction and recovery treatment services in accordance with Chapter 5 of Title 37.2 of the Code of Virginia (2015), as amended." Bylaws, Art. II.[11] (Emphasis added).

b.  "The membership of the Board shall consist of fourteen (14) individuals who shall be appointed by the Board of Supervisors of the county they represent in accordance with Section 37.2-501 and 37.2-502 of the Code of Virginia."[12]

c.  "***The Board shall be the agent of the governmental entities which have established it and shall be subject to the laws and regulations relating to such agencies of those governments*** and shall have the general powers, duties, and responsibilities of a Board as outlined in 37.2-504 of the Code of Virginia (2015), as amended."[13]

d.  Board meetings are subject to Virginia's Freedom of Information Act and public meetings laws.[14]

61.  In its 2020 federal tax return (Form 990), the Crossroads Board classified itself as "[a] federal, state, or local government or governmental unit described in section 170(b)(1)(A)(v)."[15]

62.  The Crossroads Board's audited financial statements for the years ended June 30, 2021 and 2020, were "prepared in conformity with accounting principles generally accepted in the United States of America (GAAP) *as applied to governmental units*."[16] (Emphasis added)

63.  These financial statements also note that, "In accordance with the determination by the Virginia Department of Behavioral Health and Developmental Services that ***all operating***

---

[11] https://crossroadscsb.org/wp-content/uploads/2023/04/Crossroads-Board-By-laws.pdf

[12] *Id*. at Art. III, Sec. 1.

[13] *Id*. at Art. IV (emphasis added)

[14] *Id*. at Art. VII, Sec. 6 and 7.

[15] https://projects.propublica.org/nonprofits/organizations/540988560/202200619349301550/full

[16] https://projects.propublica.org/nonprofits/display_audit/7904820211

*service boards in Virginia are governmental healthcare entities*, [the Commission] follows the governmental enterprise model."[17]

64. The financial statements further note:

Statutes authorize *local government and other public bodies, such as the Agency* [the Commission], to invest in obligations of the United States or agencies thereof, obligations of the Commonwealth of Virginia or political subdivisions thereof, obligations of the International Bank for Reconstruction and Development (World Bank), the Asian Development Bank, the African Development Bank, "prime quality" commercial paper and certain corporate notes, banker's acceptances, repurchase agreements, *and the State Treasurer's Local Government Investment Pool* (LGIP). Investments are stated at fair value.[18]

RR Board

65. In addition to the above statutes in ¶¶ 55-57 describing RR Board as a governmental entity, Relator has discovered other websites and records that reach the same conclusion.

66. The official website of Culpeper County, Virginia, notes that the RR Board was "formed in 1972 by the local governments of Planning District 9 ([the counties of] Culpeper, Fauquier, Madison, Orange and Rappahannock)."[19]

67. The Virginia Department of Behavioral Health and Development Services classifies the RR Board as an "operating" community service board, which it defines as a "public body organized in accordance with the provisions of Chapter 5 (§ 37.2-500 et seq.) that is appointed by and accountable to the governing body of each city and county that established it for the direct provision of mental health, developmental, and substance abuse services."[20]

---

[17] *Id*. (Emphasis added).

[18] *Id*. (Emphasis added).

[19] https://web.culpepercounty.gov/bc/page/rappahannock-rapidan-community-services-board

[20] https://dbhds.virginia.gov/library/community%20contracting/occ-csb-overview.pdf

68. The RR Board's audited financial statements for the years ended June 30, 2021 and 2020, acknowledge that it is "a **governmental health care entity** and is required to follow the accounting and reporting practices of the Governmental Accounting Standards Board."[21]

69. The financial statements also note that the RR Board "maintains cash accounts with financial institutions in accordance with the Virginia Security for **Public Deposits** Act of the Code of Virginia (1950), as amended."[22]

70. The financial statements further note that employees of the RR Board are eligible to participate in the Virginia Retirement System (VRS) Political Subdivision Retirement Plan, which "provides coverage to state employees, teachers, and employees of participating political subdivisions."[23]

71. The complaint in *Carpenter v. Rappahannock Rapidan Community Services Board and Area Agency on Aging*, Case No. 3:2011cv00017, filed on February 24, 2011, in the Western District of Virginia, stated in paragraph 3: "The RRCSB [Rappahannock Rapidan Community Services Board] is a governmental agency established, defined and controlled by statute." The same allegation appears in paragraph 3 of an amended complaint filed on April 21, 2011. In its answer to the amended complaint, the Rappahannock Board "admit[ted] that RRCSB is a governmental agency."

---

[21] https://projects.propublica.org/nonprofits/display_audit/7904820211 (Emphasis added)

[22] *Id*. at 18 (Emphasis added)

[23] *Id*. at 20.

**Breaks Commission**

72.     The Breaks Commission's purpose is to "develop, maintain and operate Breaks Interstate Park in cooperation with the Commonwealth of Kentucky."[24] The Breaks Interest Park is a massive interstate park "nestled in the heart of the Appalachian Mountains," known by the nickname "Grand Canyon of the South,"[25] and sits astride the state line shared by Kentucky and Virginia.

73.     The Kentucky Legislature and the Virginia Legislature created the Breaks Commission by interstate compact in 1954 ("Breaks Interstate Park Compact of 1954" or "Compact"), which allowed the two states to create, develop, and operate the Breaks Interstate Park. The U.S. Congress authorized the Compact. The Compact clearly indicates the Breaks Commission is government-owned and government-operated based on the following provisions from Virginia's enactment of the Compact:

  a. The 83rd Congress of the United States, being Public Law 275, approved August 14, 1953, authorized the Compact. VCA § 10.1-205.1, sec. 1.

  b. "The Commonwealth of Kentucky and the Commonwealth of Virginia agree to ***create, develop and operate an interstate park to be known as the Breaks Interstate Park***, which shall be located…. Said park shall be of such area and of such character as may be ***determined by the Commission created by this Compact***." *Id*. at sec. 1, art. 1 (emphasis added).

  c. "There is hereby ***created the Breaks Interstate Park Commission***, which shall be a body corporate with the power and duties set forth herein and such additional ***powers as may be conferred upon it by subsequent action of the appropriate authorities of Kentucky and Virginia***. The Commission shall consist of the Director of the Virginia Department of Conservation and Recreation or his designee and the Commissioner of the Kentucky Department of Parks or his designee as voting, ex officio members, and three

---

[24] https://www.commonwealth.virginia.gov/va-government/boards-and-commissions/comprehensive-board-listing/detail/?id=b81d296a-b375-ed11-81ab-001dd80724a2

[25] https://www.breakspark.com/

commissioners from each of the two states, each of whom shall be a citizen of the state he shall represent. ***Members of the Commission shall be appointed by the Governor***." *Id*. at sec. 1, art. 2 (emphasis added).

d. "The Commission created herein ***shall be a joint corporate instrumentality of both the Commonwealth of Kentucky and the Commonwealth of Virginia*** for the purpose of effecting the objects of this Compact, and shall be deemed to be ***performing governmental functions of the two states*** in the performance of its duties hereunder." *Id*. at sec. 1, art. 3 (emphasis added).

e. "Each Commonwealth agrees that it will authorize the Commission to exercise the right of ***eminent domain*** to acquire property located within each Commonwealth required by the Commission to effectuate the purposes of this Compact." *Id*. (Emphasis added); *see also*, sec. 2 ("The Breaks Interstate Park Commission is authorized to exercise the right of eminent domain on behalf of the Commonwealth of Virginia in acquiring land or other property required in the establishment or enlargement of a Breaks Interstate Park.")

f. "The Commission shall be entitled to the services of any State officer or agency in the same manner as any other department or agency of this State." *Id*. at sec. 1, art. 5.

74. Kentucky's version of the Compact is found in KRS 148.220.

75. The official website of the Secretary of the Commonwealth of Virginia includes the Commission on its list of "State Boards and Commissions."[26]

**Defendants' PPP Loans**

76. The Breaks Commission applied and was approved for a <u>first-draw</u> PPP loan on May 11, 2020 (loan number 4851997408), in the amount of $232,000.00, received said PPP loan, and had said PPP loan forgiven on February 9, 2021, in the amount of $233,728.88.

77. The Breaks Commission applied and was approved for a <u>second-draw</u> PPP loan on March 13, 2021 (loan number 1956988600), in the amount of $288,916.00, received said PPP loan, and had said PPP loan forgiven on January 3, 2022, in the amount of $291,195.67.

---

[26] https://www.commonwealth.virginia.gov/va-government/boards-and-commissions/comprehensive-board-listing/

78. The Charlottesville Authority applied and was approved for a <u>first-draw</u> PPP loan on April 30, 2020 (loan number 6036737305), in the amount of $202,293.00, received said PPP loan, and had said PPP loan forgiven on December 31, 2020, in the amount of $203,579.81.

79. The Charlottesville Authority applied and was approved for a <u>second-draw</u> PPP loan on March 15, 2021 (loan number 2571198603), in the amount of $270,932.00, received said PPP loan, and had said PPP loan forgiven on November 8, 2021, in the amount of $272,632.85.

80. The Rockbridge Library applied and was approved for a <u>first-draw</u> PPP loan on April 15, 2021 (loan number 4233928800), in the amount of $160,890.00, received said PPP loan, and had said PPP loan forgiven on September 1, 2021, in the amount of $161,493.89.

81. The Crossroads Board applied and was approved for a <u>first-draw</u> PPP loan on April 13, 2020 (loan number 4917457109), in the amount of $2,497,027.50, received said PPP loan, and had said PPP loan forgiven on May 18, 2021, in the amount of $2,523,365.50.

82. The RR Board applied and was approved for a <u>first-draw</u> PPP loan on April 9, 2020 (loan number 9523867005), in the amount of $2,375,000.00, received said PPP loan, and had said PPP loan forgiven on June 24, 2021, in the amount of $2,402,840.28.

83. Upon information and belief, Defendants retained their PPP funds and have not repaid them.

84. Relator reserves the right to amend this Complaint and expand these allegations upon review of the actual applications and supporting documentation submitted by each Defendant.

**Additional Allegations Regarding Defendants' Scienter and Knowledge**

85. Defendants had the opportunity and obligation to read and review the few certifications on their PPP loan applications that included the following: "The Applicant is eligible to receive a loan under the rules in effect at the time this application is submitted that

have been issued by the Small Business Administration (SBA) implementing the Paycheck Protection Program…" Defendants were also required to initial their understanding and acceptance of this certification. This particular certification was not buried in dozens of pages of legalese, but was one of a handful of key certifications requiring initialing on the second page of a two-page PPP application.

86. Further, the SBA had provided publicly available PPP loan guidance and published an April 2, 2020, PPP rule specifying that only certain entities were eligible for PPP loans, and that the list of eligible entities was found in 13 CFR 120.110. Specifically, the April 2 rule stated, "Businesses that are not eligible for PPP loans are identified in 13 CFR 120.110 and described further in SBA's Standard Operating Procedure (SOP) 50 10, Subpart B, Chapter 2, except that nonprofit organizations authorized under the Act are eligible." This CFR (13 CFR 120.110) defined the entities eligible for such SBA loans. More specifically, subjection (j) of this CFR stated that government-owned entities were not eligible.

87. A reasonable response from each Defendant should have been to ask, *Is this organization eligible for a PPP loan* and *what are the applicable PPP eligibility rules now in effect*? A simple Google search for "PPP loan eligibility rules" would have resulted in the discovery of either the SBA's April 2, 2020, interim final rule or one of many legal blogs discussing and analyzing the SBA's April 2 rule.

88. Deliberate ignorance captures "the 'ostrich' type situation where an individual has 'buried his head in the sand' and failed to make simple in queries which would alert him that false claims were being submitted." *U.S. v. Bourseau*, 531 F.3d 1159, 1168 (9th Cir. 2008). Those receiving federal funds, like Defendants, have "some duty to make a limited inquiry so as to be reasonably certain they are entitled" to those funds." *Id*.

89.     In fact, legal blogs and law-firm websites provided their readers and clients with precisely the same analysis immediately after the April 2 rule was published – i.e., that the SBA's April 2 rule was effective immediately and that applicants should review their eligibility. Here are a few excerpts from these blogs and websites:

- ***On April 2, 2020, in the late afternoon, the Small Business Administration issued an interim final rule*** (Docket No. SBA-2020-0015, the "Rules") for the administration of the Paycheck Protection Program (PPP) created under Section 1102 of the CARES Act. ***The SBA states that the Rules are effective immediately***, which takes the extraordinary step of dispensing with the 30-day delayed effective date provided in the Administrative Procedure Act.
  ***
  The Application states that the applicant certifies to its eligibility to receive a PPP loan under the version of the Rules in effect at the time the Application has been submitted.
  ***
  The Rules state that except for nonprofits made eligible for PPP loans under the CARES Act, businesses that are identified in 13 CFR 120.110 and described further in SBA's Standard Operating Procedure (SOP) 50 10, Subpart B, Chapter 2 are not eligible for PPP loans. Those businesses generally include:
  ***
  Government-owned entities. [*See*, blog printout attached in **Exhibit A**, pgs. 1-2; emphasis added.]

- The Rules and Application were issued just hours before the scheduled launch of the PPP, which, as previewed in the U.S. Treasury Department's borrower information sheet released on Tuesday, March 31, 2020, is set to begin April 3, 2020. The Rules and Application contain some significant clarifications as to how the SBA will implement the CARES Act and confirm that certain of the SBA's existing rules, which broadly impact borrower eligibility for PPP loans, will apply.
  ***
  Ineligible Industries. The Rules likewise confirm that the existing SBA regulations (in 13 C.F.R. § 120.110) regarding eligibility apply to the PPP. Therefore, businesses in certain industries remain ineligible for loans under 7(a) of the Small Business Act. [*See*, blog printout attached in **Exhibit B**, pgs. 1, 3; emphasis added.]

90.     Defendants either failed to research these readily available legal blogs, or ask the foregoing simple, basic questions to determine eligibility (which would have constituted deliberate ignorance or reckless disregard), or did ask these questions, but nevertheless

21

proceeded to apply for the PPP loan knowing that they were ineligible for the loan (which would also have constituted deliberate ignorance or reckless disregard).

91. Defendants acted at best without conducting due diligence, or at worst despite having done so, and proceeded as if no SBA rule was in effect and applicable at the time to eligibility.

92. Each Defendant effectively stuck its head in the sand, ignored performing the most basic form of due diligence (i.e., a Google search), and behaved as if no SBA rules or regulations applied to its eligibility (despite the eligibility certification on the PPP loan application).

93. Defendants disregarded the applicable nonprofit rules of the PPP program, which they knew and understood, when they submitted their PPP loan applications.

94. But for Defendants representing to the SBA on their PPP loan application that they were eligible for PPP loans, the SBA and Defendants' lenders would not have approved their PPP loan applications, paid the PPP money to Defendants, and forgiven the PPP loans in question.

95. Defendants had the benefit of the SBA's April 2, 2020 Interim Final Rule and the SBA's April 6, 2020 FAQ guidance document to learn that they were not eligible for a PPP loan, that 13 CFR 120.110(j) rendered Defendants ineligible.

**Additional Allegations Regarding Defendant Crossroads' Nonprofit Status**

96. Defendant Crossroads was further ineligible for PPP funds because it is not organized for profit, and non-profits were generally ineligible for PPP loans.

97. Crossroads describes itself as a "public nonprofit," although it does not enjoy nonprofit status with the IRS.

98. Nonprofits were categorically ineligible for first-draw PPP loans, except for 501(c)(3) or 501(c)(19) tax-exempt organizations. *See* 13 C.F.R. § 120.110(a) ("The following types of businesses are ineligible [for SBA loans]: (a) Non-profit businesses . . .").

99. At the time Defendants applied for and received their PPP loans, they understood that only such 501(c)(3) or 501(c)(19) nonprofit organizations were eligible (from all types of nonprofit organizations) for PPP loans. As shown in the screen-grab below, the very first box on the first page of the PPP loan application asked each borrower to check a small box corresponding with its legal form:

| | **Paycheck Protection Program** **Borrower Application Form** | OMB Control No.: 3245-0407 Expiration Date: 09/30/2020 |
| --- | --- | --- |
| **Check One:** ☐ Sole proprietor ☐ Partnership ☐ C-Corp ☐ S-Corp ☐ LLC ☐ Independent contractor ☐ Eligible self-employed individual ☐ 501(c)(3) nonprofit ☐ 501(c)(19) veterans organization ☐ Tribal business (sec. 31(b)(2)(C) of Small Business Act) ☐ Other | | **DBA or Tradename if Applicable** |

100. Crossroads was neither a 501(c)(3) nor a 501(c)(19) nonprofit entity.

## CAUSES OF ACTION

### COUNT 1
**Violations of the FCA, 31 U.S.C. § 3729(a)(1)(A) Against All Defendants**
**(Submitting a False Claim for Approval)**

101. The above paragraphs are realleged and incorporated herein.

102. The FCA imposes liability on one who knowingly presents or causes to be presented a false or fraudulent claim for payment or approval. 31 U.S.C. § 3729(a)(1)(A).

103. Defendants knowingly presented or caused to be presented to the SBA claims for approval of PPP loan applications for which they were ineligible because they are government-owned entities and, in the case of Crossroads, because it is not organized for profit.

104. Defendants' knowing false certifications on the PPP loan applications at issue herein were material to the government's decision to approve and then forgive their PPP loans. When submitting the PPP loan applications, Defendants had to certify they were compliant with SBA's guidance and rules, that they were eligible for the loans, and that all information included on their application forms was true and accurate in all material respects.

105. But for Defendants' submission of their false claims, they would not have received the loans.

106. By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

107. This is a claim for treble damages and penalties under the FCA, 31 U.S.C. § 3729, *et seq*. Additionally, the United States is entitled to the maximum penalty of up to $28,619 for each and every violation arising from Defendants' unlawful conduct alleged herein.

**COUNT 2**
**Violations of the FCA, 31 U.S.C. § 3729(a)(1)(B) Against All Defendants**
**(Creating a False Record or Statement Material to a False Claim )**

108. The above paragraphs are realleged and incorporated herein.

109. The FCA imposes liability on one who knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim paid or approved by the U.S. government. 31 U.S.C. § 3729(a)(1)(B).

110. Defendants knowingly made or caused to be made false records or statements to support false claims submitted to the SBA for PPP loans.

111. The false records and statements Defendants made were used to support false claims submitted to the U.S. government.

112.     By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

113.     This is a claim for treble damages and penalties under the FCA, 31 U.S.C. § 3729, *et seq*. Additionally, the United States is entitled to the maximum penalty of up to $28,619 for each and every violation arising from Defendants' unlawful conduct alleged herein.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, *qui tam* Plaintiff/Relator prays for judgment against Defendants as follows:

1. That this Court enter judgment against Defendants in an amount equal to three times the damages the United Sates has sustained because of Defendants' actions, plus a civil penalty of not less than $14,308 and not more than $28,619 (28 CFR § 85.5) for each violation of 31 U.S.C. § 3729;

2. That Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

3. That Relator be awarded all costs of this action, including attorney's fees and expenses; and

4. That Relator recover such other relief as the Court deems just and proper.

<u>**DEMAND FOR JURY TRIAL**</u>

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a trial by jury.

Dated: November 17, 2025       Respectfully submitted,

                            */s/ Bryan Quesenberry*
                            J. Bryan Quesenberry
                            Plaintiff/Relator